**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-----------------------------X
                              :
OLYMPIC DREAMS, LLC, and      :
LORI ARUTE,                   :
                              :
            Plaintiffs,       :
                              :
v.                            :      Civ. No. 3:11CV01103(AWT)
                              :
MELISSA CLARK, JOHN BRENNAN,  :
NORTH RUN, INC. OF FLORIDA,   :
NORTH RUN INC. OF NEW YORK,   :
FOX RUN LTD. OF EAST AURORA,  :
and MONTOGA, INC. f.k.a.      :
NORTH RUN, INC. OF NEW YORK,  :
                              :
            Defendants.       :
                              :
-----------------------------X
```

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Olympic Dreams, LLC and Lori Arute ("Arute") bring this action against defendants Melissa Clark ("Clark"), John Brennan ("Brennan"), North Run, Inc. of Florida, North Run Inc. of New York, Fox Run Ltd. of East Aurora, and Montoga, Inc. f/k/a/ North Run, Inc. of New York alleging common law negligence.  The defendants have moved for summary judgment. For the reasons set forth below, the defendants' motion for summary judgment is being granted in part and denied in part.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

The defendants are equine professionals who provided services as horse trainers to the plaintiffs and served as

-1-

agents of the plaintiffs in recommending and evaluating horses
for the plaintiffs to buy or lease.  The defendants also acted
as brokers in transactions in which the plaintiffs bought, sold,
or leased horses.  The allegations in this case relate to the
interactions among the parties surrounding the purchase, sale or
lease of six horses: Tucker, Lando, Palona, Denmark, Utopia and
Granted.

### A.   Tucker

Beginning in the summer of 2007, the defendants and the
plaintiffs began discussing whether the plaintiffs should
purchase a horse named Tucker.  Between June 27, 2007 and July
26, 2007, Clark made a number of statements to the plaintiffs
regarding Tucker and the combination of Tucker and Arute's
daughter, Alexandra Arute ("Alexandra").  Clark described Tucker
to the plaintiffs as "already made up and proven" and "a
successful equitation horse," and she stated that "Tucker had
nothing left to prove as he already had won at the highest
levels." (Defs.' Local Rule 56(a)(1) Stmt. ¶¶ 7, 9, 10).  Clark
further stated that horses like Tucker were extremely hard to
find.

Clark described the combination of Alexandra and Tucker as
a "fantastic and perfect match," stating that "few horse and
rider combinations are capable of winning at the highest levels.
Alex[andra] and Tucker are one of those combinations." (Id. at

¶ 8).  Thus, Clark told the plaintiffs that Tucker would be a good fit for Alexandra, that Tucker and Alexandra were a good match and were suitable for one another, and that if Alexandra rode well, she would win--or it was likely that she would win--certain events on Tucker.

Prior to purchasing Tucker, Arute paid for a pre-purchase veterinarian exam by Dr. Robert Barber.  At or around the time the examination took place, Arute spoke with Dr. Barber's office about the invoicing and the vetting report.

The plaintiffs purchased Tucker on or about July 28, 2007.  Prior to purchasing Tucker, Alexandra competed on Tucker and won two events on him.  However, within a month of Alexandra beginning to ride Tucker after purchasing him, Alexandra realized that he "engaged in misbehaviors."  (Id. at ¶ 25).  The plaintiffs, soon after purchasing him, determined that Tucker was not suitable for the purposes for which he had been purchased and believed that many of the defendants' representations and statements about him were inaccurate.

**B.  Lando**

In late 2008, the plaintiffs and defendants began discussing whether the plaintiffs should lease a horse named Lando.  Clark made a number of statements to the plaintiffs regarding Lando and the combination of Lando and Arute's daughter, T.A.  She described Lando as a "top level equitation

-3-

horse" that had competed at a very high level in top level competitions with successful results. (Id. at ¶ 29). Thus, Clark stated that Lando was "very much a proven and successful equitation horse." (Id. at ¶ 33). With regard to the combination of Lando and T.A., Clark said that Lando would be a suitable and excellent match for T.A., he would be a "wonderful teacher for T.A.," and that T.A. was very lucky to have an opportunity to get a horse like Lando. (Id. at ¶ 30).

The plaintiffs leased Lando for one year, ending November 30, 2009. Shortly after leasing him, however, Arute realized he was not suitable for T.A.

### C. **Palona**

In or around April 2008, the plaintiffs and defendants began discussing whether the plaintiffs should acquire a horse named Palona. In April and May 2008, Clark and Brennan had conversations with Alexandra and Arute about Palona and the combination of Alexandra and Palona. Clark and Brennan told Alexandra that Palona was a good horse and that she would be a good investment for her riding career. Clark also told Alexandra that Palona had done well with her previous rider and had won big competitions. Clark described Palona to Arute as "an absolutely amazing athlete with tremendous scope and ability." (Id. at ¶ 44). She further told Arute that Palona

would excel in the defendants' program and that Palona was a
wonderful match for Alexandra.

Prior to the purchase of Palona by the plaintiffs, Dr. Carl
Juul-Nielsen conducted a pre-purchase veterinarian examination.
Dr. James Belden reported the results of the examination to
Clark, saying that the horse "had sidebone, the results were all
in the realm of normal, and the horse was serviceably sound."
(Id. at ¶ 55).  Clark then told Arute that Dr. Juul-Nielsen
reported that Palona "vetted out very clean and safe."  (Id. at
Stmt. ¶ 53).

The plaintiffs purchased Palona on April 30, 2008.  The
terms of the purchase agreement included that the plaintiffs
would accept care and custody of Palona "as is," "where is," and
"with all faults."  (Id. at ¶ 41).

**D.   Denmark**

In May 2010, the plaintiffs and the defendants began
discussing a horse named Denmark.  The defendants told Arute
that Denmark would be a wonderful match for T.A. and that she
would learn a lot from him.  The plaintiffs leased Denmark for
five months in 2010 for $20,000.

Prior to the plaintiffs leasing him, Denmark had been
"nerved."  (Id. at ¶ 60).  However, T.A. was never injured while
riding Denmark, and Arute only learned that he had been nerved
after the lease expired.

### E.   <u>Utopia</u>

In or around March 2008, the plaintiffs and the defendants began discussing whether the plaintiffs should acquire a horse named Utopia.

The plaintiffs leased Utopia on March 21, 2008.  The lease agreement provided that the plaintiffs had the option to purchase Utopia when a farrier was able to nail shoes on to Utopia's feet.  At that time, the lease would expire.  The plaintiffs purchased Utopia in or around September 2008.

Prior to the acquisition by the plaintiffs of Utopia, a veterinarian examined Utopia.  The veterinarian and Brennan discussed that Utopia had a fungus, known as white line's disease, in her feet.  Additionally, Utopia had a growth on her shoulder, which the veterinarian told Brennan was a wart; the plaintiffs contend the growth was a sarcoid, which is a type of cancer.  The defendants told the plaintiffs that Utopia passed the examination.

### F.   <u>Granted</u>

In February 2008, the plaintiffs sold a horse named Granted for $175,000.  The plaintiffs paid the defendants a 15 percent commission on the proceeds of the sale, totaling approximately $26,250.  While the plaintiffs contend that the purchaser paid "significantly more than $175,000," Clark testified that the purchaser paid $185,000 for Granted and paid a $10,000

commission to the purchaser's agent, which resulted in net proceeds of $175,000.  (Id. at ¶ 79).

G.   **Procedural History**

The plaintiffs filed the present action on July 6, 2011. On January 30, 2014, the defendants moved for summary judgment on three grounds:

> (1) the Plaintiffs have not disclosed any expert, even though the deadline to do so has passed, and an expert is necessary for them to prove their case, (2) certain of the Plaintiffs' claims are barred by the statute of limitations, and (3) the representations on which the Plaintiffs base their claims were non-actionable opinions and were not false.

(Defs.' Mem. Supp. Mot. Summ. J. (Doc. No. 107-1) at 1).  The plaintiffs sought to reopen discovery to take certain depositions and to disclose an expert.  The court denied the request to reopen discovery.  During a status conference it was agreed that the parties would continue briefing at that time only the second and third grounds on which the defendants moved for summary judgment.

II. **LEGAL STANDARD**

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. See Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22

F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(a) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury.  The court, therefore, may not try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  Anderson, 477 U.S. at 255.  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law."  Id.  As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."  Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses.  Immaterial or minor facts will not prevent summary judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor."  Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v.

Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence.  "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment."  Stern v. Trs. of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (internal quotation marks omitted) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)).  Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]."  Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists.  See Celotex Corp., 477 U.S. at 324.  "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward

with specific facts showing that there is a genuine issue for trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quotation marks, citations and emphasis omitted).  Furthermore, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41.  If the nonmovant fails to meet this burden, summary judgment should be granted.

**III. DISCUSSION**

    **A.   Negligence Claims**

In the motion for summary judgment, the defendants construed all of the allegations in the Fourth Amended Complaint as relating to claims for negligent misrepresentation.  (See Mem. Supp. Mot. Summ. J. (Doc. No. 107-1) at 1 ("The undersigned Defendants . . . hereby move for summary judgment as to . . . the Plaintiff's Fourth Amended Complaint, which purports to allege claims of negligent misrepresentation.")).  In their opposition to the motion for summary judgment, however, the plaintiffs state that the complaint "alleges 48 acts of negligence--34 of which are unrelated to misrepresentations."[1] (Mem. Opp. Mot. Summ. J. (Doc. No. 132) at 2).  After examining the Fourth Amended Complaint, the court concludes that the 34 alleged acts of negligence, as set forth in the opposition to

---

[1] The plaintiffs do not appear to contest that the other 14 acts of negligence raise claims for negligent misrepresentation.

the motion for summary judgment, are pure negligence claims and not claims for negligent misrepresentation.[2]  See D'Antonio v. Am. Brands, Inc., Civ. No. B-89-461(WWE), 1991 WL 23533, *3 (D. Conn. Jan. 16, 1991 ("A court must 'look to the gist' of the factual allegations set forth in a complaint in deciding what a plaintiff's legal theory is.").

In their reply brief, the defendants argued that if the court construed the 34 non-misrepresentation claims to be pure negligence claims, they were still entitled to summary judgment on those claims.  (See Reply (Doc. No. 134) at 3).  However, because the defendants have not met their initial burden with respect to the pure negligence claims, the motion is being denied without prejudice as to those claims.

**B.   Negligent Misrepresentation Claims**

As to the negligent misrepresentation claims,[3] the defendants argue that summary judgment should be granted because (1) the alleged misrepresentations are not statements of fact, and (2) some of the claims are barred by the statute of limitations.

---

[2] The court notes that the Fourth Amended Complaint is the first complaint in this action to raise pure negligence claims.  In each of the prior three complaints, the only negligence claim was one for negligent misrepresentation.  Thus, the defendants' misconstruction of the claims in the Fourth Amended Complaint is understandable.

[3] The claims for negligent misrepresentation are found in the following paragraphs of the Fourth Amended Complaint: 18B, 18C, 25B, 25C, 34B, 34C, 34D, 45B, 45C, 45D, 52B, 52C, 59B and 59C.

"[A]n action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." Nazami v. Patrons Mut. Ins. Co., 280 Conn. 619, 626 (2006). Thus, a defendant "who, in the course of his [or her] business, profession or employment supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he [or she] fails to exercise reasonable care or competence in obtaining or communicating the information." Glazer v. Dress Barn, Inc., 274 Conn. 33, 73 (2005) (alterations omitted).

"The requirement that a representation be made as a statement of fact 'focuses on whether, under the circumstances surrounding the statement, the representation was intended as one of fact as distinguished from one of opinion.'" Meyers v. Cornwell Quality Tools, Inc., 41 Conn. App. 19, 28–29 (1996) (quoting Crowther v. Guidone, 183 Conn. 464, 468 (1981)). "It is sometimes difficult to determine whether a given statement is one of opinion or one of fact, inasmuch as the subject matter, the form of the statement, the surrounding circumstances, and the respective knowledge of the parties all have a bearing upon

-13-

the question.  Each case must in a large measure be adjudged upon its own facts."  Id. at 29 (alterations omitted).  "[A]n opinion that a certain event will arise in the future cannot form the basis of a fraud or misrepresentation claim."  456 Corp. v. United Natural Foods, Inc., No. 3:09cv1983(JBA), 2011 WL 87292, *3 (D. Conn. Jan. 11, 2011).

The defendants contend that they are entitled to summary judgment on the negligent misrepresentation claims because "the representations Ms. Clark and Mr. Brennan made about the subject horses were statements of opinion and that any representations that could be considered statements of fact were not false or misleading."  (Mem. Supp. Mot. Summ. J. (Doc. No. 107-1) at 25).[4]

With respect to Tucker, the only statement made by the defendants that could be construed as a statement of fact is that Tucker "had won at the highest levels."  While there is some ambiguity as to what could be considered "the highest level," the defendants have produced uncontroverted evidence that Tucker was a Reserve Champion at the BET/United States Equestrian Team Show Jumping Talent Search Finals-East, placed second at a Vermont Summer Festival event, and finished first at

---

[4] The plaintiffs do not address the issue of whether the alleged misrepresentations were statements of opinion or fact in their opposition to the motion for summary judgment.  The plaintiffs simply state: "Defendants argue (at pages 24-27) summary judgment should enter because their statements were not misrepresentations.  Even if that were accurate, which plaintiffs contest, summary judgment must still be denied . . . ."  (Mem. Opp. Mot. Summ. J. (Doc. No. 132) at 2).

the Jacksonville Kickoff.  (Ex. F (Doc. No. 107-7)).  The plaintiffs have not produced any evidence to show that Tucker had not won at the highest levels, and therefore they have not created a genuine issue as to whether the representation was false.  The remaining statements made by the defendants about Tucker, as set forth in section I.A, are all statements of opinion or predictions as to the probability of future events, and therefore are not statements of fact.

As to the statements about Lando, the only statement that could be construed as one of fact is that Lando competed at a high level with successful results.  Again, the plaintiffs have not produced any evidence that creates a genuine issue as to whether Lando had competed at a high level with successful results.[5]  The other alleged misrepresentations, as set forth in section I.B., are all statements of opinion, and therefore are not actionable.

With respect to the statements made about Palona, two statements could be construed as representations of fact: that Palona had won big competitions and that she "vetted out clean and safe."  The plaintiffs have not produced any evidence which could show that Palona had not won big competitions.[6]  As to the statement that Palona "vetted out clean and safe," the

---

[5] It is unclear whether the plaintiffs even dispute that Lando had competed at a high level with successful results.
[6] As with Lando, it is not clear whether the plaintiffs dispute that Palona had won big competitions.

-15-

plaintiffs appear to contend that she did not "vet out clean and safe" because she had sidebone.  However, the plaintiffs have not produced any evidence which could support a conclusion that having sidebone made Palona unsafe or means that Palona did not "vet out clean."  The other alleged misrepresentations, as set forth in section I.C., are all statements of opinion, and therefore are not actionable.

The only statements the plaintiffs contend the defendants made about Denmark are that he would be a wonderful match for T.A. and she would learn a lot from him.  Because this is a statement of opinion, and not fact, it is not actionable.

As to Utopia, the only statement the plaintiffs assert the defendants made is that Utopia passed the veterinary exam.  It appears the plaintiffs contend the statement was false because Utopia had white line's disease in her feet and because they believe the growth on Utopia's shoulder was a sarcoid tumor, and not a wart.  With respect to each point, however, the plaintiffs have not presented evidence that could support a conclusion that Utopia did not pass the veterinary exam.  Also, as to whether the growth was a sarcoid tumor or a wart, the plaintiffs do not dispute that the veterinarian told Brennan that the growth was a wart.  Thus, even if the growth was a sarcoid tumor, it is undisputed that Brennan did not know that it was not a wart.

With respect to Granted, it is unclear what false or misleading statement the plaintiffs allege the defendants made. To the extent the plaintiffs assert that the defendants lied about how much the buyer paid for Granted, the plaintiffs have presented no evidence as to the amount that was actually paid or that the amount was different than what the defendants represented.  Thus, there is no evidence which could show that the statement was false.

Because all of the alleged misrepresentations by the defendants were either statements of opinion or the plaintiffs have failed to create a genuine issue as to whether the statement was false, the motion for summary judgment is being granted as to the claims for negligent misrepresentation.[7]

**IV.  CONCLUSION**

For the reasons set forth above, the defendants' Motion for Summary Judgment (Doc. No. 107) is hereby GRANTED in part and DENIED in part.  The motion is granted as to the negligent misrepresentation claims.  The motion is denied as to the pure negligence claims.

It is so ordered.

Dated this 28th day of August, 2014, at Hartford, Connecticut.

---

[7] Because the court concludes that the statements were not actionable misrepresentations, the court does not reach the defendants' statute of limitations argument.

                                    /s/
                    _____
                         Alvin W. Thompson
                     United States District Judge